# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK R. DOLBIN,** | : | |
| **Movant** | : | **Civil Action No. 1:03-cr-00118** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Respondent** | : | |

## MEMORANDUM

Before the Court is Movant Mark Dolbin's motion to vacate, set aside, or correct sentence brought pursuant to 28 U.S.C. § 2255. (Doc. No. 250.) Since filing his initial motion alleging ineffective assistance of trial and appellate counsel and improper jury instructions, Dolbin amended his § 2255 motion to add claims of ineffective assistance of counsel at his preliminary hearing. (Doc. No. 253.) For the reasons set forth below, the motion will be denied.

## I.    BACKGROUND

Movant Mark Robertson Dolbin was indicted on May 14, 2003, for conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, as well as distribution and possession with intent to distribute 500 grams or more of methamphetamine. (Doc. No. 1.) The indictment was subsequently amended multiple times to include the charges of possession of firearms by an armed career criminal, obstruction of justice, and forfeiture, resulting in the fourth and final superseding indictment being filed on August 4, 2004. (Doc. No. 121.) Dolbin pleaded not guilty and went to trial, along with co-Defendant Ly Bun Mey, on March 7, 2005. (Doc. Nos. 127, 182.) On March 10, 2005, the jury returned a verdict against Dolbin on four counts: conspiracy to distribute and possess methamphetamine, distribution and possession with intent to distribute methamphetamine, possession of firearms by a convicted felon, and obstruction of justice. (Doc. No. 200, at 1.) The jury found co-Defendant Mey not

guilty.[1] On July 25, 2005, Dolbin was sentenced to life in prison. (Doc. No. 199.) Dolbin

successfully appealed that sentence and was re-sentenced to 240 months in prison on August 20,

2007. (Doc. No. 233.)

Dolbin filed a "consolidated application to proceed *in forma pauperis*" on February 1,

2008, in response to which this Court sent a notice of election. (Doc. Nos. 239, 243.) Dolbin

returned the notice of election indicating his desire to file one, all-inclusive § 2255 motion at a

later date. (Doc. No. 244.) Dolbin then filed a motion to extend time to file his § 2255 motion,

but attached the "working copy" of his motion to vacate thereto. (Doc. No. 248, 250.) To

preserve the filing date of the motion to vacate, the Court ordered that the attachment be

docketed as a § 2255 motion and later allowed Dolbin leave to supplement the claims he had

already included in his § 2255. (Doc. No. 253.) The Government has now responded to all of

Dolbin's claims, and Dolbin has replied to the Government's arguments. Dolbin's motion to

vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255, is now before the Court for

disposition.

## II.     DISCUSSION

### A.      Ineffective Assistance of Trial Counsel

At trial, Dolbin was represented by Attorney Nicholas Quinn. Dolbin alleges that Quinn

was ineffective for failing to move to sever the charges of conspiracy and drug possession from

the felon in possession of firearms and obstruction of justice counts. (Doc. No. 251.)

Specifically, Dolbin contends that revelation to the jury of his fifteen-year-old convictions "and

---

[1]In Court, Roger Frey, one of the Government's key witnesses, misidentified Mey in
court. (Trans 2. at 188.) Additionally, Mey testified on his own behalf that, while he knew the
passenger in his car possessed drugs, he did not possess or distribute drugs. (Trans. 4 at 36-47.)

other concomitant spillover evidence" was improperly prejudicial and contributed to the jury verdict against him. Dolbin also argues that Quinn should have moved to sever his trial from that of co-Defendant Ly Bun Mey. Dolbin admits that Federal Rule of Criminal Procedure 8 provides for "liberal joinder" of claims against one Defendant and joint trials against multiple Defendants, but argues that his counsel should have moved for relief from joinder and for severance pursuant to Rule 14 because joinder of the claims against him was, in this case, prejudicial.

To succeed on an ineffective assistance of counsel claim, a defendant must show that his counsel's performance was deficient, which is to say that it "fell below an objective standard of reasonableness," and that he was prejudiced by his counsel's deficient performance. Outten v. Kearney, 464 F.3d 401, 414 (3d Cir. 2006) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). Because failure to establish either prong results in denial of a defendant's claim, a court may begin its analysis with either prong of the test. United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002). In assessing counsel's conduct, there is a "strong presumption" that counsel acted reasonably, and "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. With respect to the prejudice prong, a defendant must prove that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

### 1. Dolbin was not Prejudiced by Counsel's Alleged Errors

The Court takes up its analysis of Dolbin's claim with the prejudice prong of the Strickland test. Though Dolbin's brief suggests reasons counsel may have stipulated to his past convictions, moved to sever the claims against him, and moved to bifurcate the trial, Dolbin has

not shown that, but for counsel's decisions on these matters, there is a probability the jury would have found him innocent of the crimes charged. This is true whether the Court considers the prejudice established by each of these alleged deficiencies individually or all the issues alleged cumulatively. See Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008) ("Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process.").

The evidence that supports Dolbin's guilty verdict is, simply put, immense. The Government's first witness, Agent Tyer, testified that a man by the name of Roger Frey was discovered transporting drugs during a drug interdiction stop of a bus in Colorado. (Trans. 2 at 34-60.) Frey confessed to the crime and cooperated with the Government, eventually admitting that he was delivering the drugs to the person later identified as Mark Dolbin, a Pottsville, Pennsylvania resident. (Id.)

Next, Roger Frey himself testified. Frey confessed that he was transporting methamphetamine for Mark Dolbin. Frey testified that he met Dolbin through a cousin, saw him in possession of large quantities of cash, and knew him to be a methamphetamine dealer before they began working together. (Id. at 65-70.) Frey further testified in detail that he took a trip to California, purchased methamphetamine with money that was sent to him in pizza boxes, gave the methamphetamine to a man named "Blaze" to transport back to Pennsylvania, reconnected with Blaze in Pennsylvania, and then personally transferred four pounds of methamphetamine to Mark Dolbin. (Id. at 71-81.) Frey also testified that he purchased drugs for Dolbin a second time. Frey testified that for the second trip, Dolbin gave him $55,000 in cash to take to California to

purchase five more pounds of methamphetamine. (Id. at 88-91.) Frey explained to the jury that federal authorities intercepted him in Colorado with the methamphetamine in his suitcase, but that he cooperated with the police and agreed to complete the drug transaction with Dolbin. (Id. at 91-97.) Under police surveillance, Frey called Dolbin to make arrangements for Dolbin to retrieve him, and the drugs, at the Harrisburg bus station. (Id.) Frey testified that Dolbin arrived at the bus station at the appointed time in a blackish Mercedes. (Id. at 96.) Frey stated that, while wearing a wire and being observed by police, he placed the luggage containing the methamphetamine[2] in the trunk of the Mercedes, and entered Dolbin's vehicle. (Id. at 96-97.) Frey testified that he was in the Mercedes with Dolbin when police officers attempted to stop the vehicle, and Dolbin evaded them by initiating a high-speed car chase. (Id. at 99.) Frey explained that Dolbin eventually abandoned the vehicle and fled on foot in an attempt to avoid arrest. (Id.) Last, Frey testified that Dolbin had used two firearms in the course of their transactions, one of which was a Streetsweeper rifle that Dolbin brandished for the purpose of showing Frey "that he had fire power." (Id. at 101-03.)

The Government also introduced a tape recording that was made of the conversation between Frey and Dolbin when Dolbin picked Frey up from the bus station. (Id. at 104.) That recording memorialized Dolbin referring to "crystal" and making "five out of four." (Id.) Frey testified that both of these references were related to methamphetamine. (Id. at 104-05.)

Next, the Government produced testimony from DEA Agent John Langan. Langan stated that he observed the controlled purchase between Frey and Dolbin at the Harrisburg bus station.

---

[2]The police had actually replaced the methamphetamine with a non-controlled substance, though Frey testified he was unaware of this fact at the time he completed the transaction with Dolbin. (Trans. 2 at 99.)

(Id. at 163-65.) Langan identified Dolbin as the man in the Mercedes who picked Frey up from the bus station, and stated that he observed the two depart the bus station together in the Mercedes with Frey's suitcase—and the sham methamphetamine—in the trunk. (Id. at 165-66.)

Lower Paxton Township Police Officer Alonzo Piper testified that he arrested Mark Dolbin when Dolbin was attempting to hitch a ride to Pottsville from a location two miles from the scene where the high-speed car chase had ended the previous day. (Id. at 170-71.) Piper made the arrest because Dolbin matched the description given by the officers involved in the chase of the man who had fled. (Id. at 172.)

DEA Agent Joseph Myers testified that he was also involved in the arrest of Mark Dolbin. Agent Myers stated that he tested the package of white powder initially found in Colorado in Roger Frey's luggage. The substance was determined to be approximately five pounds of crystal methamphetamine. (Id. at 175-78.) Agent Myers also discussed his observations of the monitored calls between Frey and Dolbin during which Frey made plans with Dolbin to meet at the Harrisburg bus station. (Id. at 182-83.) Myers further testified that he was part of the effort to follow Dolbin's Mercedes from the bus station, stop the vehicle, and arrest Dolbin. (Id. at 185-89.) Myers described the high-speed chase that ensued wherein Dolbin drove in excess of 100 miles per hour and into oncoming traffic in an attempt to evade police. (Id.) Agent Myers also testified that he later executed a search warrant on a storage unit rented in Dolbin's name. (Id. at 192.) In the storage unit, Myers uncovered two firearms and a stolen yellow Mercedes Benz with a broken trunk. (Id. at 193-94.)

Karlene DiCello, Dolbin's fiancée, also testified against Dolbin. She admitted that Dolbin called her after he was arrested and asked her to remove from their residence a gun and a scale.

(Id. at 211.) She had been unaware these items were in the home, so she asked James Connors, a friend of Dolbin's, to remove them. (Id.) DiCello testified that, even after Connors removed one firearm and a scale from the home, police executed a search warrant on the house and found approximately $10,000 in cash and another firearm. (Id. at 212-215.) DiCello also told the jury that, after Dolbin's arrest, he called to tell her that he had a yellow Mercedes in a storage unit and that there was money for her in the trunk. (Id. at 215-16.)

Byron DiCello, Dolbin's stepson, testified that he had been asked to remove "baggies" from his house at his mother's request after Dolbin's arrest. (Id. at 228-33.) He also revealed that he had once accidentally seen a cooler full of white powder at his home, though he could not confirm that the substance was methamphetamine. (Id.)

The Government next produced the testimony of Edward Hunt, Dolbin's cell mate at Cumberland County jail. Hunt testified that Dolbin gave him a note to hold during a cell search. (Id. at 235-37.) Hunt, in turn, gave the note to prison authorities. The note was addressed to "Jack," which is the name of one of Mark Dolbin's brothers. The note stated that Dolbin would have cash in ten days to pay an attorney and asked Jack to remove firearms being stored in his aunt's former bedroom in his mother's house. (Id. at 237.) The note also requested that Jack retain Attorney Dimitriou on Dolbin's behalf. (Id.) Attorney Dimitriou did in fact enter an appearance for Dolbin on June 5, 2003. (Doc. No. 14.) In a separate incident, Dolbin asked Hunt to collect approximately $60,000 in drug debts for Dolbin so that Dolbin would have money to pay his legal fees. (Trans. 2 at 239-40.) At the time, Dolbin and Hunt both believed Hunt was on the verge of being released. (Id.) Hunt testified that he wrote down the names and addresses of the two debtors from whom Dolbin told him to collect the money. (Id. at 242-43.) In later

testimony, Cameron Dolbin confirmed that the two men identified by Hunt were known friends or acquaintances of his brother, Defendant Mark Dolbin. (Trans. 3 at 13.) Both notes were produced for the jury.

James Connors, self-described as Dolbin's best friend, testified next. Connors admitted that he removed a scale and a rifle from Dolbin's resident at DiCello's request, and that he eventually turned those objects over to the police. (Trans. 2 at 255-57.) Connors further stated that DiCello asked him to go to a storage unit rented by Dolbin to recover money from the trunk of a car located within. (Id. at 258.) Connors explained that, with the help of Mark Dolbin's brother, Cameron, and others, he broke into the storage unit and pried open the trunk of a yellow Mercedes. (Id. at 260-61.) He admitted that he recovered satchels containing over $40,000 cash, methamphetamine, and multiple handguns from the car. (Id. at 261-63.) He hid one satchel himself and gave another to Cameron Dolbin for disposal. (Id. at 264.) They left one shotgun in the car, however, because they did not want to risk someone seeing the larger shotgun in their own vehicle once they left the premises. (Id.)

Cameron Dolbin also testified. His account echoed Connors' account of breaking into his brother's storage unit. (Trans. 3 at 6-8.) He stated that they removed three bags from a yellow Mercedes, and the bag he took possession of contained several handguns. (Id. at 10.)

DEA Agent Michael Mish testified that when he executed a search warrant on a different storage facility rented by Defendant Dolbin, he found telephone bills and other documents with Mark Dolbin's name on them. (Id. at 24.) Mish also found a recipe for how to manufacture methamphetamine and a video entitled "Cookin' Crank with Uncle Fester" in the unit. (Id. at 25-26.) The Government produced copies of these documents and items at trial. (Id. 25-26.)

DEA Agent Barrett was able to corroborate the testimony of many of the Government's prior witnesses. Barrett corroborated Roger Frey's testimony that Dolbin wired Frey money via Western Union through the records of the money transfer. (Id. at 60-61.) Barrett corroborated the testimony of other DEA Agents when he stated that he, too, observed Frey and Dolbin in a black Mercedes at the Harrisburg bus station, which eventually resulted in a high-speed car chase. (Id. at 37-40.) Barrett corroborated James Connors' testimony that Connors turned over to the police a rifle and scale which Connors said had been removed from DiCello and Dolbin's residence. (Id. 43-45.) Barrett corroborated the testimony of Ed Hunt when he explained that he recovered in excess of a dozen firearms in Dolbin's aunt's bedroom, located within Dolbin's mother's home. (Id. 46-47.) Barrett corroborated Cameron Dolbin when he stated that he recovered a black bag containing three handguns hidden under leaves near Cameron Dolbin's house. (Id. 50.) Barrett also corroborated DiCello's testimony that $10,000 cash and a shotgun were found at her residence. (Id. at 42-43.) The shotgun found was identified as a Streetsweeper, which matched Frey's description of the firearm Dolbin had shown to him. Last, as Defendant points out in his brief, Agent Barrett did testify that Defendant had prior convictions: a 1985 conviction for possession with intent to deliver drugs, 1987 convictions for possession with intent to deliver drugs and possession of a prohibited offensive weapon, and a 1987 conviction for "causing or risking a catastrophe." (Id. at 62-64.) No details related to these offenses were disclosed, and they were not expounded upon in any way.

The Government also produced testimony of Ceven Huer Kong. Kong, known by the nickname "Lazy," admitted he did not know Mark Dolbin, but he corroborated Roger Frey's testimony related to how Frey made his purchases of methamphetamine in California. (Id. at

143.) Kong testified that he sold four pounds of methamphetamine to Roger Frey on one occasion and five more pounds on a second occasion. (Id. at 150, 152.)

To say the least, the evidence against Defendant Dolbin was significant. Even if Defense Counsel Quinn had made a successful motion to sever the charges against Dolbin, bifurcate the trial, or had stipulated to the prior offenses, the Court cannot find any reasonable probability that the jury's verdict would have been different in light of the tremendous amount of evidence against Dolbin. Even if a separate trial had been held on each charge and no evidence of any past conviction or other crime had been admitted, the end result would assuredly remain unchanged.

The Court arrives at this conclusion not only in light of the sheer number of witness accounts which inculpated Dolbin on each of the four charges, but with particular consideration of the way the different, unrelated witnesses' accounts corroborated each other, fit together, and were enhanced by the direct evidence produced through the police investigation. For example, Frey's testimony was corroborated by documentation, receipts, and phone records in addition to the testimony of DEA Agents and Kong. Multiple agents were able to testify as to their personal knowledge of different aspects of Frey's testimony, bolstering it tremendously. Moreover, the testimony of Dolbin's friends and family was consistent not only with itself and the recorded phone calls and intercepted message Dolbin made to them, but also with the evidence police found during the investigation of Connors' home, the storage units, and Dolbin's residence. Lastly, the recorded statements of Dolbin speaking about "crystal" and questioning Frey as to how to make "five out of four" were particularly damning. The compelling and thorough nature of the evidence provided against Dolbin as to not only the drug trafficking charges, but also the possession of firearms charge and the obstruction of justice charge simply makes untenable

Defendant's claim that any prejudice which may have resulted from inclusion of his past convictions, Quinn's failure to bifurcate or sever the charges, and Quinn's failure to act on the litany of other unsupported grounds referred to in passing in Defendant's brief. Because Dolbin cannot show even a small likelihood that the verdict rendered would have been different had counsel pursued a different trial strategy, his ineffective assistance of counsel claim must fail.

### 2.     Counsel's Performance was not Deficient

Notwithstanding Dolbin's failure to demonstrate prejudice, the Court also notes that Dolbin's argument that Defense counsel was ineffective for failing to sever his trial from that of co-Defendant Mey does not hold water. (Doc. No. 187.) First, Mey and Dolbin were charged as part of the same conspiracy, thus the claims were properly joined under Federal Rule of Criminal Procedure 8. See United States v. Eufrasio, 935 F.2d 553, 567 (3d Cir. 1991). Although Rule 14 provides that "if it appears that the defendant . . . is prejudiced by a joinder of offenses or of defendants . . . the court may order an election or separate trials," Dolbin has not shown any prejudice that resulted from the joint trial, a prerequisite for a successful motion to sever. Fed. R. Crim. P. 14. Counsel cannot be deemed ineffective for failing to make a motion that would have been deemed unsuccessful. Eufrasio, 935 F.2d at 568 (requiring a defendant to demonstrate that failure to sever resulted in "clear and substantial prejudice resulting in a manifestly unfair trial" to succeed on such a claim).

Though Mey testified, his testimony did not touch in any way upon the likelihood of Dolbin's guilt or the believability of witnesses against Dolbin. If anything, Mey's testimony benefitted Dolbin because, if believed, it provided impeachment evidence against Frey, a primary Government witness implicating Dolbin. Moreover, the jury was clearly able to

compartmentalize the evidence produced against Mey and the evidence produced against Dolbin since they arrived at two distinct verdicts for the two Defendants. United States v. De Peri, 778 F.2d 963, 984 (3d Cir. 1985) ("The proper question on appeal is whether the jury could have been reasonably expected to compartmentalize the allegedly prejudicial evidence . . . ."). Dolbin has not demonstrated that a motion to sever his trial from that of Mey would have been meritorious, thus Attorney Quinn cannot be deemed ineffective for failing to make such a motion.

Likewise, Dolbin's argument that Attorney Quinn was ineffective for failing to move to sever the firearm, drug trafficking, and obstruction of justice charges is unavailing. Evidence of weapons would have been admissible against Dolbin at a trial for drug trafficking, and vice versa, thus a motion to sever would have had little chance of success. Evidence of firearm use has been recognized as "tools of the narcotics trade," allowing at least some evidence of firearm use to be admitted as circumstantial evidence of drug trafficking in drug trafficking trials even when not charged as a separate offense. United States v. Russell, 134 F.3d 171, 183 (3d Cir. 1998) ("[I]t has long been recognized that firearms are relevant evidence in the prosecution of drug-related offenses, because guns are tools of the drug trade."). Conversely, possession of drugs has been held admissible in a firearms possession case as evidence of a motive to possess firearms. See United States v. Gorecki, 813 F.2d 40, 42-43 (3d Cir. 1987) (denying motion to sever claim because "possession of the weapon would likely be admissible in the drug case" and Rule 404(b) would admit evidence of drug trafficking as motive not to register weapons); see also, United States v. Morena, 547 F.3d 191 (3d Cir. 2008) (admission of some evidence of drug transactions acceptable under Rule 404(b) to show motive, but overuse may cause incurable

prejudice). Indeed, the testimony relating to the firearm possession charges and the drug trafficking charges overlapped, indicating that the judicial considerations of efficiency weighed in favor of joining the claims because many witnesses would have had to testify twice. Eufrasio, 935 F.2d at 568 (discussing that, in determining a motion to sever, the trial court should consider the public interest in judicial economy as well as prejudice to the defendant). Thus, any motion to sever the firearm from the drug trafficking claims would have been nonmeritorious.

Dolbin's argument that Attorney Quinn should have moved to sever the obstruction of justice charge is incorrect for the same reason. Dolbin's attempts to rid his residence of drug and firearm evidence would likely have been admissible in a trial only charging his drug distribution or his firearm possession because it is evidence that he participated in drug distribution and possessed firearms. Also, due to the fact that the obstruction of justice was linked to his firearm possession and drug trafficking, the interrelated nature of the charges would have made a bifurcated trial inefficient, and complete separation of all evidence of drug and gun use from the obstruction attempt, impossible.

For the reasons stated above, the Court finds that, even when taking all alleged facts as true and in the light most favorable to Defendant Dolbin, Dolbin has not demonstrated that he was prejudiced by Defense Counsel's performance. Not only would motions to sever or bifurcate the trial have had little chance of success, but the evidence presented against Dolbin on each count was overwhelming and did not bear solely on the credibility of one or two witnesses, thus it cannot be said that prejudice, rather than the evidence, resulted in the verdict against him. See Morena, 547 F.3d at 196 (stating that if a case against a defendant is strong and the evidence overwhelming, improperly-admitted prejudicial evidence does not violate due process).

**B.    Clear Error in Jury Instructions/Ineffective Assistance For Failing to Challenge Jury Instructions**

Dolbin argues that the jury instructions used at trial in Counts III and IV violated his right to due process. Counts III and IV of the Fourth Superseding Indictment charged Dolbin with "possession of firearms by an armed career criminal" in violation of 18 U.S.C. §§ 922(g) and 924(e) and with obstruction of justice in violation of 18 U.S.C. §§ 1512(c)(1)-(2) and 2. Dolbin first alleges that the instructions the Court provided for these charges impermissibly relieved the Government of its burden of proof that he was convicted of three or more crimes punishable by more than one year because the instructions implied that Dolbin's prior criminal convictions were "established fact." Dolbin also contends that the Court's instruction that flight may be taken as consciousness of his guilt improperly implied that the flight may be taken as evidence of his guilt as to the felon-in-possession charge as well as the obstruction of justice charge, in addition to the drug trafficking charges. He also argues that the wording of the instruction implied that he had already been convicted of committing the crimes charged. Last, Dolbin alleges that the submission to the jury of a summary chart prepared by the Government was so prejudicial as to violate his due process rights.

To succeed on a claim of a trial error that is raised for the first time on collateral review, a defendant must show that there was "cause" for the failure to raise the issue on direct appeal and that there was "prejudice" resulting from the failure, or, that he is actually innocent of the crimes charged. Hodge v. United States, 554 F.3d 372, 379 (3d Cir. 2009). If a defendant cannot meet either requirement, the claim will be dismissed as procedurally defaulted. Id.

Dolbin's initial motion does not appear to allege cause and prejudice from the failure to object to the jury instructions on the above-mentioned bases at trial. Yet, in his "objections" to

the Government's brief in opposition to his § 2255 motion, he requests that the claim be considered as part of an ineffective assistance of counsel claim. An allegation that defense counsel was ineffective may satisfy the cause requirement of this test. Id. Accordingly, in construing the motion in the light most favorable to Dolbin, a *pro se* litigant, the Court will examine the claims of improper jury instructions as additional claims of ineffective assistance of counsel–that Attorney Quinn was ineffective for failing to object to the jury instructions on the bases mentioned in Dolbin's motion.

With respect to Dolbin's first challenge, that the jury instructions relieved the Government of its burden of proof on the felon-in-possession charge, the Court clearly instructed the jury that the Government has the burden of proof as to each element of each of the crimes charged. The Court re-emphasized this directive at least seven more times in the course of the closing jury instructions. (Trans. 4 at 101, 102, 110, 112-113, 123, 132.) In discussing the charge that Dolbin possessed firearms and ammunition as a convicted felon in violation of 18 U.S.C. § 922(g)(1) and 924(e), the Court specifically instructed:

> In Count 3, the Defendant Mark Robertson Dolbin is charged in the fourth superseding indictment with being a previously convicted felon in possession of firearms and ammunition. Ly Bun Mey is not charged with this crime.
>
> Specifically, Count 3 of the indictment reads, Beginning at a time unknown to the grand jury and continuing through approximately June 1st, 2003, in Dauphin County and Schuylkill County, Pennsylvania, within the Middle District of Pennsylvania and elsewhere, the Defendant Mark Robertson Dolbin, having been convicted in the Schuylkill County Court of Common Pleas of three or more violent felonies or serious drug offenses or both in the following cases, Number 257-CA-1984, Number 748-CA-1981, Number 12-CA-1982, Number 27-CA-1982, which are crimes punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting commerce firearms and ammunitions as listed below.

You will see in the copy of the indictment that's provided to you that there are nine firearms listed there in the indictment. The indictment alleges that Mr. Dolbin was in possession in violation of Title 18, United States Code, Section 922(g)(1) and 924(c).

The crime of being a felon in possession of firearms has three essential elements: First, that the defendant has been convicted of a crime punishable by imprisonment for a term exceeding one year; secondly, that the defendant thereafter knowingly possessed firearms and ammunition; and, finally, that these firearms and ammunition were transported across the state line at some time during or before the defendant's possession of them.

You're instructed that possession with intent to deliver drugs, possession of a prohibited offensive weapon, and causing or risking a catastrophe are each crimes punishable by imprisonment for more than one year under the laws of Pennsylvania. These are the crimes of which the defendant is alleged to have been previously convicted.

If you have found beyond a reasonable doubt that the firearms and ammunition in question were manufactured in a state other than Pennsylvania or internationally and that the defendant possessed the firearms and ammunition in Pennsylvania, then you may, but you're not required to, find that they were transported across the state line. The term "firearm" means any weapon which will or is designed to or may be readily converted to expel a projectile by the action of an explosive.

The crime of being a previously convicted felon in possession of firearms or ammunition is a general intent crime, not a specific intent crime. That means that the Government must prove beyond a reasonable doubt that the defendant knowingly possessed the firearms and ammunition in question. The Government is not required to prove the defendant knew that it was unlawful for a previously convicted felon to possess firearms.

(Trans. 4 at 128-31.) The record indicates, then, that the jury was instructed that the three or four convictions testified to by Agent Barrett all carried a penalty of one or more years in prison. The Court did not instruct the jurors that they needed to conclude that Dolbin was convicted of the prior crimes, or that he possessed firearms and ammunition. Simply put, the Court instructed the jury as to an apparent stipulation entered into by the parties—that the crimes for which Dolbin was allegedly convicted each carried a sentence of one or more years—to minimize prejudice to

Dolbin that might arise from stating more details related to the alleged convictions or the precise terms for which he was imprisoned. Similarly, the Court instructed the jury as to the parties' stipulation that the weapons were manufactured outside Pennsylvania, but emphasized that the jury could determine whether they were transported across state lines. (Id. at 111-12.) Dolbin has not shown any way that the jury instructions on this charge improperly abdicated the Government's burden of proof. Attorney Quinn was not ineffective for failing to raise this issue. Indeed, as set forth in detail in the preceding section, the overwhelming evidence presented against him at trial would prevent the Court from finding prejudice even in the event such decision was erroneous.

Dolbin next argues that it was prejudicial for the indictment to state:

> Defendant Mark Roberston Dolbin, having been convicted in the Schuylkill County Court of Common Pleas of three or more violent felonies or serious drug offenses or both in the following cases . . . which are crimes punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting commerce firearms and ammunition as listed below.

(Id. at 128-29.) Though the indictment does include such a statement, the jury was instructed that the indictment was not to be taken as proof or evidence of the crimes charged therein. Specifically, the Court stated, "I remind you, jurors, that an indictment itself is not evidence. It merely describes the charges made against the defendants. It is an accusation. It may not be considered by you as any evidence of the guilt of either defendant." (Id. at 114.) This curative instruction, combined with the Court's explanation that Dolbin's prior convictions were an element of one of the crimes charged by the Government, indicates that Dolbin was not prejudiced such that the Court would have any reasonable suspicion the outcome of the trial would have been different absent the presentation of that information to the jury.

The Court now turns to Dolbin's complaint that he was prejudiced when the Court referred to him as "a previously convicted felon" in the discussion of the obstruction of justice charge. (Id. at 131.) Since being a previously conducted felon is not relevant to his guilt regarding the obstruction of justice charge, unnecessary reiteration of this fact has the possibility of causing some prejudice to Defendant. However, the jury had already been presented with evidence that Dolbin had a prior criminal history and was a convicted felon. Given that evidence of his past felony convictions was admissible in reference to the felon in possession of firearms count, the Court finds that the mere reference to his criminal history one additional time was not unduly prejudicial. It is implausible that this additional reference to Dolbin's criminal history affected the outcome of Dolbin's case, in light of the mountain of evidence against him.

Defendant also takes issue with the Court's instruction that flight from law enforcement may be taken as circumstantial evidence of guilt. (Id. at 132.) The instruction stated:

> Jurors, you've heard evidence concerning Defendant Mark Robertson Dolbin's flight from law enforcement agents on May 12th, 2003, following his alleged commission of crimes as charged by the Government. Evidence of the defendant's flight after a crime has been committed may be considered by you to prove the defendant's consciousness of guilt. Whether or not evidence of flight shows a consciousness of guilt and the significance, if any, to be attached to such circumstances are matters solely for your determination.

(Id. at 131-32.) Courts have consistently held that evidence of flight is admissible and may be interpreted as an indication of consciousness of guilt. United States v. Green, 25 F.3d 206 (3d Cir. 1994) (evidence of defendant's flight was properly admitted to show consciousness of guilt when defendant fled upon spotting federal authorities); United States v. Miles, 468 F.2d 482, 489-90 (3d Cir. 1972) (finding proper trial judge's instruction that flight may be deemed evidence of guilt). In this case, the instruction was warranted because Roger Frey and several

law enforcement officers testified that Dolbin attempted to flee from law enforcement by initiating a high-speed car chase, abandoning his vehicle, and evading police on foot. The instruction given by the Court is almost synonymous with that currently recommended by the Third Circuit Model Criminal Jury Instructions.[3] See Third Circuit Criminal Jury Instructions 4.30.

Though Dolbin argues that the Court's use of the definite pronoun "the" rather than the indefinite pronoun "a" prejudicially implied that he definitively had committed the alleged crime and did flee, rather than leaving those questions for the jury's determination. The Court disagrees. Taken as a whole, the instruction does not imply that evidence of Defendant's flight need be accepted, that the Government had affirmatively proved that Defendant committed the crimes alleged, or that the evidence of flight necessarily indicated Defendant's guilt. Rather, the instruction informed the jury that they *could*, at their own discretion, take the evidence related to Defendant's flight and use it as evidence that Defendant knew he had committed the crimes charged. Moreover, though the instruction did not indicate which crimes the evidence of flight may indicate Defendant was conscious of, Dolbin's contention that it improperly implied the jury may take the evidence of flight as evidence of the obstruction of justice charge is meritless. Juries are assumed to "attend closely the particular language of the trial court's instructions in a

---

[3]The model instruction reads as follows: "You have heard testimony that after the crime was supposed to have been committed, [Dolbin evaded police attempts to arrest him.] If you believe that [Dolbin fled police], then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that he committed the crime charged. . . . Whether or not this evidence causes you to find that the defendant was conscious or his guilt of the crime charged, and whether that indicates that he committed the crime charged, is entirely up to you as the sole judges of the facts." Third Circuit Criminal Jury Instructions 4.30.

criminal case and strive to understand, make sense of, and follow the instructions given them."

United States v. Hernandez, 176 F.3d 719, 734 (3d Cir. 1999) (quoting Francis v. Franklin, 471

U.S. 307, 324 (1985)). It is not rational for anyone to conclude that flight which occurred before

a crime is alleged to have occurred could be an indication of consciousness of guilt for the

subsequent crime. Accordingly, the Court finds that Dolbin has not shown this jury instruction to

be prejudicial in any way, and Defense Counsel was not deficient for failing to object to it.

Last, Dolbin argues that admission of the Government's summary chart, effectively a

time line of what the Government argued happened in the case, was prejudicial and should not

have been admitted. The Court notes that the chart was not initially submitted to the jury with the

other exhibits. (Trans. 4 at 145.) Rather, the jury requested to see the chart during deliberations.

(Id.) Defense Counsel Quinn did object to the submission of the chart to the jury, but his

objection was overruled. (Id. at 146.) To the extent Dolbin argues that Quinn was ineffective for

making only a "weak" objection, which resulted in his objection being overruled, this argument

fails. (Id. at 147.) After determining that the chart contained a concise time line of what the

Government believed it had proved and was supported by evidence presented at trial, the Court

admitted the chart into the jury room as an exhibit. The Court included the following cautionary

instruction with the chart:

> The chart or time line contains a summary of what the Government
> believes the evidence in the case established. As I instructed you
> earlier, the determination of the facts in the case is yours. The chart
> will be provided to you with the understanding that it represents the
> Government's summary of what it believes is the evidence.

(Id. at 147.) The Third Circuit Court of Appeals has upheld the introduction of summaries or

charts as a means to clarify an abundance of evidence. See United States v. Syme, 276 F.3d 131,

151 (3d Cir. 2004); Third Circuit Model Criminal Jury Instructions 4.10 & 4.11. The Government created the time line, and the Court admitted it, to help the jury organize the information presented. A jury is presumed to follow the Court's instructions, and the instructions clearly provided that the chart was not evidence, but rather a summary of the Government's case. The instruction emphasized that it was for the jury to determine whether the facts alleged on the chart occurred. Thus, particularly when considered in light of the strongly-worded admonition to the jury that the chart was not evidence, but rather a summary of the Government's view of the case, the Court finds that Dolbin was not prejudiced by its admission.

Accordingly, Dolbin's arguments that the jury instructions violated his right to due process or were the result of ineffective assistance of counsel will be denied.

### C.     Ineffective Assistance of Appellate Counsel

On appeal, Dolbin was represented by Damien Schorr. Dolbin contends that Schorr was ineffective for failing to argue on appeal that Dolbin's trial counsel was ineffective. This argument is meritless because ineffective assistance of counsel is a claim that is ordinarily considered only in collateral proceedings. United States v. Thornton, 327 F.3d 268, 271 (3d Cir. 2003) ("It has long been the practice of this court to defer the issue of ineffectiveness of trial counsel to a collateral attack."). While a claim of ineffective assistance may be considered on direct appeal in the rare circumstances where the record is sufficient to allow determination of the issue, the Third Circuit Court of Appeals has held that even in such instances, the better practice is to consider the claim first at the district court level in collateral proceedings. Id.; see also Massaro v. United States, 538 U.S. 500 (2003). Indeed, Dolbin has now properly raised the issue and has had a chance to litigate his ineffective assistance of counsel claims. Both

because he has brought such claims before the Court in this motion and because the Court has found them non-meritorious, Dolbin cannot claim that he was prejudiced by appellate counsel's failure to raise his ineffective assistance claim on direct appeal.

###### D. Preliminary Hearing Counsel's Conflict of Interest

Last, Dolbin alleges an ineffective assistance claim against pre-trial Defense Counsel Emmanuel Dimitriou. Attorney Dimitriou represented Dolbin at the pretrial stage from June 5, 2003, until December 19, 2003. (Doc. Nos. 14, 59.) While representing Dolbin, Dimitriou advised Dolbin to participate in a proffer session with the Government. Dimitriou also filed a motion to suppress evidence, but withdrew from the representation prior to argument on the motion. (Doc. Nos. 15, 54.) Dimitriou sought recusal from the case on two bases: potential conflict of interest and breakdown of communications between attorney and client. Dimitriou explained that James Dennison, a former client, would be a potential witness for the Government against Dolbin. (Doc. No. 54 ¶ 8.) Dimitriou stated that continued representation of Dolbin would result in a violation of Pennsylvania Rule of Professional Conduct 1.9, which states that an attorney who has formerly represented a client shall not thereafter represent another person in a similar matter with interests materially adverse to the former client. Dimitriou's withdrawal motion also explained that Dolbin had failed to pay him a nonrefundable retainer and failed to comply with his advice, which led to deterioration of the relationship between attorney and client. (Id. ¶¶ 15-16.) Dolbin suggests that Dimitriou's loyalty to Dennison created an actual conflict of interest that existed prior to his withdrawal and that the conflict was materially adverse to Dolbin's best interests because the proffer session did not result in a plea bargain.

Dolbin urges the Court to find that Dimitriou's advice that Dolbin enter into a proffer session with the Government was motivated by Dimitriou's desire to help Dennison.

Claims that counsel had an actual conflict of interest with the defendant are generally cognizable in § 2255 proceedings. United States v. Morena, 547 F.3d 191, 198 (3d Cir. 2008). In this case, the alleged conflict stems not from joint representation, but multiple representation, which means an actual conflict is less likely to exist. Duncan v. Morton, 256 F.3d 189, 197 (3d Cir. 2001) ("Actual conflict is more likely to occur in cases of joint representation (of co-defendants at the same trial) than in cases of multiple representation (of co-defendants at separate trials)."). Also, a potential conflict of interest is insufficient to support a Sixth Amendment violation. Id. To prove a conflict of interest that violates the Sixth Amendment, a defendant must show "1) multiple representation that 2) created an actual conflict of interest that 3) adversely affected the lawyer's performance." Government of Virgin Islands v. Zepp, 748 F.2d 125, 135 (3d Cir. 1984). A court must make the determination of whether the conflict violates the Sixth Amendment in consideration of the "circumstances surrounding the particular case." Id. at 134. Though prejudice will be presumed if the defendant shows an actual conflict of interest, a defendant must nonetheless demonstrate that there was a lapse in representation contrary to the defendant's interests. Palmer v. Hendricks, 592 F.3d 386, 398 (3d Cir. 2010); United States v. Gambino, 864 F.2d 1064, 1070 (3d Cir. 1988). A defendant can do this by 1) demonstrating a plausible alternative defense strategy or tactic that might have been pursued and 2) that such a tactic was inherently in conflict with the attorney's other loyalty. Gambino, 864 F.2d at 1070.

Dolbin posits the following facts in support of his theory that a conflict of interest existed in violation of his Sixth Amendment right to counsel.[4] Attorney Dimitriou became aware of the potential conflict of interest arising from his representation of Dolbin and his prior representation of Dennison early-on in the case. Dolbin revealed to Attorney Dimitriou that Dennison was involved in the conspiracy, and Dennison had, likewise, come to Attorney Dimitriou for advice regarding his role in the conspiracy. Knowing, then, that Dolbin's proffer session with the Government would likely reveal information about Dennison's involvement, Dimitriou nonetheless advised Dolbin to proffer with the Government so that Dolbin might receive a plea bargain capping his sentence at ten years. Plea negotiations between Dolbin and the Government fell through on or around October 8, 2003. Dimitriou stated his intent to withdraw from Dolbin's representation by November 25, 2003, at the latest. (Doc. No. 50.) On or around December 2, 2003, Attorney Dimitriou formally moved to withdraw his appearance on behalf of Dolbin. (Doc. No. 54.) On December 19, 2003, Dimitriou's motion was granted, and by December 22, 2003, Attorney Quinn was retained in his place. (Doc. No. 60.) Dolbin did not sign a plea agreement with the Government, went to trial, and did not testify on his own behalf because the Government would have used his proffer statements to impeach him.

Dolbin argues that these facts indicate that Attorney Dimitriou's advice to talk to the Government demonstrates a conflict of interest and a decision adverse to Dolbin's best interests. Yet, these facts also indicate that Attorney Dimitriou knew that any discussion Dolbin had with

[4]The Court takes all facts alleged by Dolbin as true unless conclusively refuted by the record. Because the Court finds that the facts as alleged and records of the case show conclusively that Dolbin is not entitled to relief, there is no need for an evidentiary hearing. United States v. Day, 969 F.2d 39, 41 (3d Cir. 1992). Moreover, Attorney Dimitriou is unavailable for an evidentiary hearing, as he passed away prior to the filing of this motion.

the Government would likely inculpate, rather than benefit, James Dennison. It is difficult, then, to understand how Attorney Dimitriou's suggestion that Dolbin implicate the person Dimitriou was allegedly trying to protect demonstrates an actual conflict of interest.

First, Dennison was not indicted for the conspiracy with Dolbin and had, according to Dolbin's implications, been working with the Government from shortly after Dolbin's arrest. Though Attorney Dimitriou had been retained by Dennison in other matters, Dennison was not indicted for this conspiracy at any point, thus Dimitriou was not at any time representing co-defendants in this same action. Moreover, to the extent Dolbin suggests that his proffer directly disadvantaged him because it bolstered the credibility of Dennison's potential testimony against him, Dolbin acknowledges that the Government would have been unable to use Dolbin's proffer statements for that purpose. The Government had agreed that Dolbin's statements could only be used against him at trial if he testified to materially different facts. (Doc. No. 293 at 8.) In addition to being unavailable at trial for the purpose of bolstering Dennison's testimony, the statements were never used at all because Dennison was never called to testify against Dolbin. Dolbin simply cannot show from these facts that there was an actual conflict of interest or that Dimitriou's loyalty to Dennison had any ill-effect on his representation of Dolbin.

Moreover, Dolbin has not posited a different defense strategy that could have been taken but would have worked to Dennison's detriment. The only other defense strategy that could have been taken so early in the litigation would have been to not cooperate with the Government and to assert his Fifth Amendment right to silence. It is untenable that this strategy would have been adverse to Dennison's interests, and inconceivable that it could have been more damaging to Dennison's interests than the strategy actually advised by Dimitriou. A coincidence of interests

is not tantamount to a conflict of interests. See Gambino, 864 F.2d at 1071 ("[T]here is no conflict of interest . . . if an attorney at trial does not raise a defense on behalf of his client because to do so is not in that client's interest even though it is also in the interest of another client that it not be raised.").

It is true that the proffer session made it difficult for Dolbin to testify at trial because he admitted to many of the charges against him. However, as Dolbin admitted in his brief, the initial strategy was to cooperate with the Government so as to receive the benefit of a plea bargain and downward departures at sentencing rather than to attend trial. In light of the significant evidence against him, this strategy appears entirely reasonable. The Court further notes that the record indicates that Attorney Dimitriou did not simply abandon Dolbin amid important plea negotiations. Instead, the record reveals that plea negotiations between Dolbin and the Government had broken down by October 8, 2003. (Doc. No. 35 ¶ 12.) Dimitriou did not move to withdraw from representing Dolbin until over a month later. (Doc. No. 54.) Further, Dimitriou arranged for another attorney to represent Dolbin at the arraignment for the Superceding Indictment, which indicates that Dimitriou did not leave Dolbin without assistance at any key point in the proceedings. Dolbin was able to retain Attorney Quinn within days of Attorney Dimitriou's formal motion to withdraw. Thus the record refutes Dolbin's assertion that Dimitriou's decision to withdraw from the case had, in itself, an adverse impact on his case.

The Court finds that Dolbin has not demonstrated an actual conflict of interest by pre-trial counsel Dimitriou that amounts to a violation of his Sixth Amendment right to counsel.

III.    CERTIFICATE OF APPEALABILITY

As required by Rule 11 of the Rules Governing Section 2255 proceedings, the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To merit the issuance of a certificate of appealability, the defendant must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As stated above, Dolbin has not shown that he was prejudiced by any of defense counsel's alleged inadequacies. Accordingly, reasonable jurists would agree that he has not made a showing of the denial of a constitutional right, and there exists no basis for a certificate of appealability with respect to this motion.

## IV.  CONCLUSION

In conclusion, for the foregoing reasons, Dolbin's motion to vacate, correct or modify sentence will be denied. Dolbin has not demonstrated that trial counsel, appellate counsel, or pre-trial counsel provided ineffective assistance in violation of his Sixth Amendment rights. Because the Court was able to conclusively determine the merits of the motion without a hearing, Defendant's motions for hearings will also be denied. A certificate of appealability is unwarranted in this case.

An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK R. DOLBIN,** | : | |
| Movant | : | **Civil Action No. 1:03-cr-00118** |
| | : | |
| v. | : | **(Chief Judge Kane)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| Respondent | : | |

## ORDER

AND NOW, this 11th day of May 2010, upon consideration of Mark Dolbin's motion to vacate, set aside and correct sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 250), motion for notice of setting for evidentiary fact-finding hearing (Doc. No. 272), consolidated motion for partial judgment on the pleadings (Doc. No. 266), and motion to dismiss as frivolous and without merit government's motion to dismiss pro-se petitioner's section 2255 (Doc. No. 258), **IT IS HEREBY ORDERED THAT THE MOTIONS** are **DENIED**. A certificate of appealability shall not issue.

                                                  \_\_\_\_\_ S/ Yvette Kane _____
                                                  Yvette Kane, Chief Judge
                                                  United States District Court
                                                  Middle District of Pennsylvania